******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* WILLIE MCFARLAND
## (SC 20802)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

Convicted of two counts of murder, the defendant appealed to this court. Although the murders occurred in 1987, the case remained unresolved until scientific advancements in DNA testing led to new findings that resulted in the defendant's arrest in 2019. In a pretrial motion to dismiss the murder charges, which the trial court denied, the defendant claimed that the thirty-two year delay between the murders and his arrest violated his rights under the due process clauses of the federal and state constitutions. On appeal, the defendant renewed his constitutional claims and also challenged the trial court's decision not to order a new competency hearing as well as an evidentiary ruling. *Held*:

The trial court properly rejected the defendant's federal and state due process claims arising from the prearrest delay, as the defendant failed to establish that his conviction offended the community's sense of fair play and decency.

With respect to its rejection of the defendant's claim under the federal constitution, this court unanimously adhered to existing precedent applying a two-pronged test to prearrest delay claims pursuant to which a defendant, to establish a due process violation, must demonstrate that actual and substantial prejudice resulted from the delay and that the state delayed the defendant's arrest to obtain an unfair tactical advantage or for other improper purposes.

With respect to this court's rejection of the defendant's claim under the state constitution, a majority of this court adopted a balancing test similar to that endorsed by the trial court, pursuant to which the defendant must make a threshold showing of actual and substantial prejudice, the state then must establish the reasons for the delay, and, finally, the trial court balances the prejudice to the defendant against the state's reasons for the delay.

The trial court did not abuse its discretion when it declined to order a new competency evaluation of the defendant after finding him competent to stand trial.

The trial court had already ordered four competency evaluations, and, in the absence of a substantial change in circumstances raising a reasonable doubt as to the defendant's competency, the trial court properly declined to order a fifth competency evaluation.

Moreover, contrary to the defendant's claims, it was not improper for the trial court to rely on its own observations of the defendant's behavior or to consider a prior competency report in denying the defendant's request for another competency evaluation.

The trial court did not abuse its discretion in declining to admit certain out-of-court statements by a deceased witness, S, under the residual exception to the hearsay rule because, although there was a reasonable necessity for their admission, the statements were disjointed, inconsistent, implausible and unreliable, S was never subject to cross-examination regarding the numerous inconsistencies in her statements, the statements contained multiple layers of hearsay, and the fact that S signed two of the statements under penalty of law and made handwritten edits to one of them did not otherwise render the statements trustworthy and reliable.

(*Six justices concurring separately in three opinions*)

Argued October 31, 2024—officially released September 2, 2025

*Procedural History*

Substitute information charging the defendant with two counts of the crime of murder, brought to the Superior Court in the judicial district of New Haven, where the case was tried to the jury before *Vitale, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed*.

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Robert J. Scheinblum*, special assistant state's attorney, with whom, on the brief, were *John Doyle*, state's attorney, *Seth Garbarsky*, supervisory assistant state's attorney, and *Lisa M. D'Angelo*, executive assistant state's attorney, for the appellee (state).

*Opinion*

PER CURIAM. In August, 1987, the decomposed bodies of the victims, Fred Harris and his son, Gregory Harris, were found murdered in an apartment they shared in Hamden. The crime went unsolved until 2019, when scientific advancements in DNA testing led to the arrest of the defendant, Willie McFarland. The defendant now appeals from his conviction of both murders,

following a jury trial in 2022. The primary issue on appeal is whether the thirty-two year delay between the 1987 murders and his 2019 arrest violated the defendant's right to due process under the federal and state constitutions. The defendant also claims that the trial court abused its discretion by (1) declining to order a new competency evaluation after previously finding him competent to stand trial, and (2) finding that a deceased witness' statements included in police reports were not admissible under the residual exception to the hearsay rule because they did not manifest the required guarantees of trustworthiness and reliability. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. On August 27, 1987, the Hamden police received a call from a relative of the victims indicating that they had not been seen or heard from since August 21. The police conducted a welfare check of the victims' apartment and discovered their badly decomposed bodies lying side by side in an upstairs bedroom. Both victims had sustained fatal throat lacerations, and their hands and feet had been bound with cord or wire. Gregory Harris also had a nonfatal stab wound to his chest, and Fred Harris had two fatal stab wounds to his chest.

There was no sign of forced entry, and the door was locked when the police arrived. The apartment had been ransacked, and a boom box in the bedroom had apparent stab marks. The police found a baking pan with melted butter and a butter wrapper next to the victims' bodies, as well as a yellow work glove that matched another glove discovered outside of the apartment. A black handled kitchen knife, later identified as the murder weapon, was found in the bathroom sink, and Fred Harris' brown leather wallet, containing his identification cards and a volunteer firefighter's badge, was found on the living room floor.

The defendant was released from prison on August 20, 1987, which was the day before the victims were last seen alive. In the early morning hours of August 22, the Hamden police arrested the defendant approximately one mile away from the victims' apartment for sexually assaulting a female acquaintance, C.[1] During the sexual assault incident, the defendant had used a knife and was discovered with "a fair amount of blood" on him at the time of that arrest. The following week, after the discovery of the bodies of the victims in the present case, detectives interviewed the defendant about his location at the time of the murders. The defendant denied any involvement in the murders. He initially denied knowing the victims but later acknowledged that he might have known Gregory Harris from a car wash where they had worked together. The detectives initially accepted his explanation that he was covered in his own blood when he was arrested because C had accidentally stabbed him. The bloody clothing that he was wearing was not preserved or connected by the police to the victims' murders.

In the late 1980s and early 1990s, the police explored the possibility that Lee Copeland, a friend of Gregory Harris, had been involved in the murders. Donald Bruce Hankins gave a statement to the police that appeared to implicate Copeland. Copeland's friend, Veronica Saars-Doyle, also gave a series of inconsistent statements to the police that implicated Copeland, Hankins, and, eventually, herself in the murders.

In March, 1996, the defendant, still incarcerated after pleading guilty to sexually assaulting C in 1987, contacted the Hamden police to confess to the victims' murders. He explained that he was motivated to confess

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify C or others through whom her identity may be ascertained. See General Statutes § 54-86e.

because he had found religion. The defendant also had been diagnosed with a serious medical condition and believed that he would die in prison. Between that time and February, 1997, he provided a series of written and verbal confessions that evolved over time and contained many internal inconsistencies. Notably, although the defendant's earlier confessions minimized his own involvement while attempting to implicate C, the Latin Kings street gang, and others against whom he harbored resentments, in his later confessions, he took sole responsibility for the murders. In his confessions, the defendant accurately described numerous aspects of the crime scene that only the perpetrator could have known. These included the exact locations and orientations of the victims' bodies in the apartment, the cord or wire used to bind their hands and feet, the injuries inflicted, the location of and damage to the boom box, the identification and location of the murder weapon in the upstairs bathroom sink, the presence of the melted butter and butter wrapper, and a description of Fred Harris' wallet and badge. The defendant stated that he had socialized with Gregory Harris in the apartment on two or three prior occasions and that he had been welcomed into the apartment on the night of the murders and had locked the door upon leaving. Law enforcement officials were unable to confirm other aspects of the defendant's confessions that were not consistent with the crime scene evidence, and the state elected not to prosecute the defendant at that time.

By 2006 or so, scientific advancements allowed the police to isolate and test small amounts of DNA, otherwise known as "touch DNA." The police obtained a sample of the defendant's DNA pursuant to a search warrant. In 2009, examiners at the state forensic science laboratory conducted an analysis and concluded that the defendant could be eliminated as a contributor to

the DNA inside the yellow work glove found at the crime scene.

The case remained unsolved for an additional decade. In 2018, after further scientific advancements in DNA testing, the police resubmitted the DNA to the state forensic science laboratory for analysis. Examiners used a newly developed test that was much more effective at generating data from degraded samples of genetic material. On the basis of this new analysis, the examiners concluded that the DNA found inside the yellow work glove was "consistent with . . . being a mixture of four contributors, with at least one of them being male," and that "the DNA profile . . . [would be] at least 1.5 million times more likely to occur if it originated from [the defendant] and three unknown individuals than if it originated from four unknown individuals." Around the same time, the police requested a DNA sample from Copeland, which he voluntarily provided. The match between the crime scene DNA and Copeland's DNA sample was deemed "inconclusive." Michael T. Bourke, a DNA analyst with the state forensic science laboratory, testified that the "inconclusive" result indicated that it was somewhere between 1 and 1000 times more likely that the crime scene sample was made up of DNA from Copeland and three unknown individuals than four unknown individuals.

On the basis of this new DNA testing, in 2019, the state charged the defendant with the victims' murders. Following his arrest, the defendant sought to represent himself but otherwise refused to participate in the proceedings. Between January, 2020, and October, 2022, the trial court ordered several competency evaluations of the defendant. Initially, the court found the defendant not competent. Ultimately, the defendant was restored to competency, over defense counsel's objections.

The case was tried to a jury in 2022. At trial, the defendant sought to introduce, under the residual excep-

tion to the hearsay rule, police reports containing Saars-Doyle's statements implicating Copeland in the murders. The trial court denied the defendant's request and excluded Saars-Doyle's statements from evidence. The jury returned a verdict of guilty on both counts of murder in violation of General Statutes § 53a-54a (a), and the trial court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective term of 120 years of imprisonment. This direct appeal followed. See General Statutes § 51-199 (b) (3).

I

The defendant first claims that the thirty-two year delay between the crimes and his arrest violated his right to a fair trial under the due process clauses of the federal and state constitutions.[2] In *State* v. *Morrill*, 197 Conn. 507, 522, 498 A.2d 76 (1985), and *State* v. *Carrione*, 188 Conn. 681, 693–94, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983), this court adopted the two-pronged approach to prearrest delay[3] claims brought under the federal due process clauses, as construed by *United States* v. *Marion*, 404 U.S. 307, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971), and *United States* v. *Lovasco*, 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977). Under that two-pronged test, "[i]n order to establish a due process violation because of [preaccusation] delay, the defendant must show both that actual substantial prejudice resulted from the delay and that the reasons for the delay were wholly unjustifiable, as [when] the state seeks to gain a tactical advantage over the defendant."

[2] The defendant raised these constitutional claims in a pretrial motion to dismiss.

[3] Courts generally use the terms "prearrest delay," "preindictment delay," and "preaccusation delay" interchangeably in the due process context. See, e.g., *United States* v. *Sowa*, 34 F.3d 447, 450 (7th Cir. 1994), cert. denied, 513 U.S. 1117, 115 S. Ct. 915, 130 L. Ed. 2d 796 (1995); *State* v. *Police*, 343 Conn. 274, 286 n.9, 273 A.3d 211 (2022).

*State* v. *Morrill,* supra, 522; see, e.g., *State* v. *Roger B.*, 297 Conn. 607, 614–15, 999 A.2d 752 (2010); *State* v. *Littlejohn,* 199 Conn. 631, 645–47, 508 A.2d 1376 (1986). In the present case, the trial court concluded that the defendant could not prevail under the two-pronged test because there was no evidence that the state had delayed arresting him to obtain an unfair tactical advantage or for other improper purposes.

The trial court then conducted a thorough analysis pursuant to *State* v. *Geisler,* 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), of the defendant's independent claims brought under the due process clauses of the Connecticut constitution. See Conn. Const., art. I, §§ 8 and 9. The trial court concluded that the Connecticut constitution confers broader protections under which courts apply a balancing test to prearrest delay claims brought under the state due process clauses. The trial court then concluded that the defendant could not prevail under the balancing test. Even assuming that the defendant had suffered the required actual and substantial prejudice, the trial court found that the prearrest delay was wholly justified because the state promptly initiated the prosecution once newly developed DNA testing technologies implicated the defendant in the murders.

We unanimously conclude that the trial court properly rejected the defendant's federal and state due process claims arising from the prearrest delay in this case because he has failed to establish that his conviction offended "the community's sense of fair play and decency . . . ." (Citation omitted; internal quotation marks omitted.) *United States* v. *Lovasco,* supra, 431 U.S. 790. With respect to the federal constitutional claims, we unanimously adhere to our existing precedent applying the two-pronged test. See, e.g., *State* v. *Roger B.*, supra, 297 Conn. 614–15; *State* v. *Morrill,* supra, 198 Conn. 522.

With respect to the defendant's claims brought under the Connecticut constitution, a majority of this court adopts a balancing approach similar to that endorsed by the trial court in this case, which reflects the approach employed by the United States Courts of Appeals for the Fourth, Seventh and Ninth Circuits, and a minority of other states. See, e.g., *United States* v. *Sowa*, 34 F.3d 447, 451 (7th Cir. 1994), cert. denied, 513 U.S. 1117, 115 S. Ct. 915, 130 L. Ed. 2d 796 (1995); *Howell* v. *Barker*, 904 F.2d 889, 895 (4th Cir.), cert. denied, 498 U.S. 1016, 111 S. Ct. 590, 112 L. Ed. 2d 595 (1990); *United States* v. *Moran*, 759 F.2d 777, 782–83 (9th Cir. 1985), cert. denied, 474 U.S. 1102, 106 S. Ct. 885, 88 L. Ed. 2d 920 (1986). The specific reasoning of the majority of the court is explained in two separate concurring opinions. One opinion is a plurality opinion authored by Justice Alexander and joined by Chief Justice Mullins and Justice Dannehy. The other opinion is authored by Justice Ecker and joined in part by Justice McDonald. Both opinions adopt the same balancing test under the Connecticut constitution, pursuant to which a criminal defendant bears the burden of proving that a delay in prosecution has caused actual and substantial prejudice; once the defendant has made this threshold showing, the burden shifts to the state to establish the reasons for the delay. Both concurring opinions conclude that the defendant's prearrest delay claim fails under this balancing test.

In contrast, Justice D'Auria, in his concurring opinion, concludes that the Connecticut constitution provides no greater protection against prearrest delay than the due process clause of the federal constitution. He, therefore, would follow the approach of a majority of the federal courts of appeals and other states, which adopt the two-pronged test set forth in *Marion* and *Lovasco*, as explained in *State* v. *Morrill*, supra, 197 Conn. 522, that requires the defendant to prove both

actual and substantial prejudice, and that the state delayed arrest to obtain an unfair tactical advantage or for other improper purposes. See, e.g., *United States* v. *Crouch*, 84 F.3d 1497, 1514 (5th Cir. 1996), cert. denied, 519 U.S. 1076, 117 S. Ct. 736, 136 L. Ed. 2d 676 (1997), and cert. denied sub nom. *Frye* v. *United States*, 519 U.S. 1076, 117 S. Ct. 736, 136 L. Ed. 2d 676 (1997); see also id., 1511–12 (citing cases); D. Diethrich, Note, "If It Ain't Broke, Don't Fix It: Indictment Delays and Due Process," 15 Elon L. Rev. 181, 193 n.83 (2023) ("[o]f our nation's federal appellate courts, the First, Second, Third, Sixth, Eighth, Tenth, and Eleventh Circuits have either firmly adopted the two-prong[ed] approach or have indicated that this was the correct application to a [preindictment] delay challenge"). With no proof of delay for tactical purposes or bad faith, Justice D'Auria would also reject the defendant's state constitutional claims.

## II

The defendant next claims that the trial court abused its discretion by declining to order a new competency evaluation after finding him competent to stand trial. He argues that the trial court should not have relied on one of several earlier competency reports and his unwillingness to participate in the legal proceedings. We disagree and conclude that the trial court did not abuse its discretion when it denied defense counsel's request for another competency evaluation.

## A

While his case was pending in the trial court, the defendant consistently refused to participate in and requested to be excused from the proceedings unless he could represent himself. From the outset, he expressed his belief that the prosecution against him was brought in retaliation for an action he had filed against the state. The defendant claimed that he was seeking a restraining

order against the state, but he refused to elaborate until "the media and the grand jury" were present.

In January, 2020, the trial court found that the defendant was not competent to stand trial or to represent himself, but that he could be restored to competency with inpatient hospitalization and treatment. The court ordered that the defendant be transferred to Whiting Forensic Hospital (Whiting) for sixty days to restore his competency.

In July, 2020, the trial court held another hearing on the defendant's competency. Although the defendant continued to refuse to participate in the proceedings, the forensic monitor at Whiting, Susan McKinley, testified that he had "certainly demonstrated the ability to cooperate and collaborate" with the evaluation team. On the basis of this testimony and other evidence, the court found that the defendant was competent to stand trial and scheduled a separate hearing to determine his competency to represent himself.

In May, 2021, the trial court held that separate hearing to determine whether the defendant was competent to represent himself. After excusing the defendant at his request, the court heard the testimony of Evan Vitiello, a psychiatrist, and reviewed the competency reports that he had prepared. It was Vitiello's opinion that the defendant was not competent to represent himself because he showed deficits in communication, attention, and concentration, as well as an extreme distrust of the criminal justice system. The court credited Vitiello's opinion and found that the defendant was not competent to represent himself.

In September, 2022, as jury selection was scheduled to begin, defense counsel expressed his belief that the defendant still was not competent to stand trial. The defendant interjected and requested to be excused, and the trial court granted his request. Defense counsel

requested that the court order another competency evaluation because the defendant had refused to meet with him on numerous occasions over the course of two years and had not replied to his letters. Defense counsel indicated that the defendant continued to harbor delusions regarding the nature of the prosecution and that he expected that the case would be resolved by a nonexistent civil action. The court ordered another competency evaluation.

The evaluators at the Connecticut Mental Health Center reported that they were unable to complete another competency evaluation because the defendant refused to participate. In October, 2022, the trial court held another competency hearing. The court admitted into evidence the prior competency reports, and the state presented testimony from a counselor who regularly interacted with the defendant at the correctional facility where the defendant was being held and had observed that the defendant appropriately interacted with him and other inmates. The defendant introduced testimony from Howard Zonana, a forensic psychiatrist at the Connecticut Mental Health Center. Zonana testified that he had never met or interacted with the defendant and that his review of the prior competency evaluations provided the basis for his opinion. He testified that the defendant's conduct and diagnoses were consistent with a person suffering from narrow, specific delusions that rendered his behavior nonvolitional.

The trial court issued a comprehensive oral ruling, concluding that the defendant was competent to stand trial. The court, relying on its own observations, as well as the opinions of the evaluators, found that the defendant had the ability to participate in the proceedings but chose not to "because of what he believes to be his own self-interest, a position arguably borne of his lengthy past and presumably negative interactions with the criminal justice system and periods of incarcer-

ations, which [have] created a mistrust of the legal system in him." The court did not credit Zonana's opinion that the defendant's delusions rendered him incompetent. The court denied defense counsel's motion for reconsideration and request that the staff at Whiting reevaluate the defendant's competency.

B

The following well established legal principles govern our review of this claim. "[T]he due process clause of the fourteenth amendment to the United States constitution prohibits the criminal prosecution of a defendant who is not competent to stand trial." (Internal quotation marks omitted.) *State* v. *Dort*, 315 Conn. 151, 162, 106 A.3d 277 (2014). "[T]he test for competency must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (Internal quotation marks omitted.) *State* v. *Johnson*, 253 Conn. 1, 21, 751 A.2d 298 (2000). This standard for competency to stand trial is "a relatively low one" and will not be satisfied by proof of "mental illness or reduced mental capacity" alone. *State* v. *Connor*, 292 Conn. 483, 524, 973 A.2d 627 (2009).

This constitutional rule has been codified in General Statutes § 54-56d, which establishes the procedures and standards governing the determination of a defendant's competence to stand trial. See *State* v. *Campbell*, 328 Conn. 444, 485–86, 180 A.3d 882 (2018). Under § 54-56d, "[a]ny party before the court—including the court itself—may raise the issue of the defendant's competency at any time during a criminal proceeding by requesting that the court order a competency examination." *State* v. *Dort*, supra, 315 Conn. 163–64. Section 54-56d compels a court to order a competency examination "any time a reasonable doubt is raised regarding the

defendant's competency. . . . To establish such reasonable doubt, the defendant must present substantial evidence, not merely allegations, that he is incompetent." (Citation omitted; internal quotation marks omitted.) *State* v. *Ross*, 269 Conn. 213, 272, 849 A.2d 648 (2004). Given the trial court's superior ability to observe the defendant's conduct, we review the trial court's decision whether to order a competency examination for abuse of discretion. See, e.g., *State* v. *Campbell*, supra, 486; *State* v. *Ross*, supra, 270.

On this record, we conclude that the trial court did not abuse its discretion in denying defense counsel's request that it order a fifth competency evaluation. The court already had ordered four such evaluations, the last of which delayed jury selection. Although the defendant chose not to cooperate with the fourth evaluation, the hearing provided defense counsel with the opportunity to present further evidence in support of the request. The primary evidence defense counsel offered was Zonana's testimony, which the trial court found to be unpersuasive. The court also carefully considered, and did not find compelling, defense counsel's claim that the defendant was unable to assist in his defense as a result of his delusions. The trial court instead relied on its own observations and credited expert testimony from the evaluators who had met and interacted with the defendant that the defendant was intentionally uncooperative. The court found that the defendant had the ability to interact with others when he chose to do so and that his actions constituted a strategic choice in order to delay the trial.

In the absence of a substantial change in circumstances raising a reasonable doubt as to the defendant's competency, the trial court properly declined to order a fifth competency evaluation. See, e.g., *State* v. *Ross*, supra, 269 Conn. 273 (trial court properly declined to order competency evaluation because defendant failed

to present substantial evidence to establish reasonable doubt as to his competency); *State* v. *Norris*, 213 Conn. App. 253, 275–76, 277 A.3d 839 (trial court properly declined to order new competency evaluation because defendant failed to present evidence that his condition had changed since prior competency evaluation), cert. denied, 345 Conn. 910, 283 A.3d 980 (2022).

We are not persuaded by the defendant's argument that the trial court erred in considering the July, 2020 competency evaluation in connection with its decision to deny the request for an evaluation in October, 2022. The court's inquiry was properly focused on whether the defendant was competent at the later time, and it was not error for the court to consider the defendant's prior mental health history. See, e.g., *State* v. *Campbell*, supra, 328 Conn. 493 (upholding trial court's competency finding that rejected Zonana's testimony and considered other competency reports and supporting testimony from evaluators); *State* v. *Edwards*, 158 Conn. App. 119, 137, 118 A.3d 615 (court did not abuse its discretion in relying on observations, input, and previous competency evaluation as bases for not ordering additional competency evaluation), cert. denied, 318 Conn. 906, 122 A.3d 634 (2015). In fact, defense counsel asked the court to rely on the January, 2020 and May, 2021 evaluations finding the defendant incompetent to stand trial and to represent himself, and to credit Zonana's testimony that was founded on those reports.

We also are not persuaded by the defendant's argument that the trial court improperly relied on its own observations of the defendant's behavior. A trial court is uniquely situated to observe and assess a defendant's competency. It is not improper for a trial court to rely on those observations as part of the competency determination. See, e.g., *State* v. *Glen S.*, 207 Conn. App. 56, 76, 261 A.3d 805 (defendant's failure to cooperate with competency evaluators was relevant to trial court's

assessment of defendant's competency), cert. denied, 340 Conn. 909, 264 A.3d 577 (2021), cert. denied, U.S. , 142 S. Ct. 2685, 212 L. Ed. 2d 768 (2022); *State* v. *Hines*, 165 Conn. App. 1, 16–17, 138 A.3d 994 (trial court properly considered defendant's behavior during competency hearing), cert. denied, 321 Conn. 920, 137 A.3d 764 (2016); *State* v. *Jordan*, 151 Conn. App. 1, 35–36, 92 A.3d 1032 (trial court properly considered its own observation of defendant's behavior, including his voluntarily leaving courtroom), cert. denied, 314 Conn. 909, 100 A.3d 402 (2014). Accordingly, we conclude that the trial court did not abuse its discretion in declining to order another competency evaluation.

## III

The defendant's final claim is that the trial court abused its discretion by excluding Saars-Doyle's statements implicating Copeland in the murders.[4] He argues that the trial court should have admitted those statements under the residual exception to the hearsay rule and challenges the court's finding that Saars-Doyle's multilayered hearsay statements were unreliable and untrustworthy. We conclude that the trial court did not abuse its discretion by excluding Saars-Doyle's statements.

## A

During the state's case-in-chief, defense counsel cross-examined Sean Dolan, a detective employed by

---

[4] The defendant frames this evidentiary claim as having a constitutional dimension because the trial court's exclusion of Saars-Doyle's statements violated (1) his due process rights, causing him to suffer prejudice as a result of the prearrest delay, and (2) his constitutional right to present a defense. We address the claim as a purely evidentiary matter because of our conclusion that the court correctly determined that Saars-Doyle's statements were not admissible under the residual exception to the hearsay rule. See, e.g., *State* v. *Bennett*, 324 Conn. 744, 764, 155 A.3d 188 (2017) ("[b]ecause the trial court's evidentiary ruling was not improper, the defendant's claim of an infringement on his constitutional right to present a defense on this basis must fail").

the Hamden Police Department since 1995. When defense counsel inquired about Dolan's review of Saars-Doyle's statements, the prosecutor objected. The trial court excused the jury, and defense counsel made an extensive proffer seeking to introduce several police reports containing Saars-Doyle's statements, as well as Dolan's related testimony. Some of those police reports contain verbatim transcriptions of Saars-Doyle's recorded statements. Others are narrative summaries of her statements to the police and of informal conversations with her, only some of which were recorded fully or in part. In addition to Saars-Doyle's own observations, the police reports contain numerous statements that she claimed were made by third parties. Defense counsel contended that Saars-Doyle's statements were relevant to establish Copeland's third-party culpability and were admissible under the residual exception to the hearsay rule. See Conn. Code Evid. § 8-9.

The proffered police reports reveal that, between 1987 and 1990, the Hamden police obtained a series of statements from Saars-Doyle. These statements described her relationships with Copeland and the victims, and provided increasing amounts of detail relevant to the murders. Her audio-recorded and transcribed July 23, 1990 statement asserted that her prior statements were inaccurate as a result of medical problems and substance abuse. In that statement, she implicated Copeland, Hankins, and a third person named "Gus" in the murders; she asserted that they committed the murders while she waited in a car. When Saars-Doyle met with the police the next day to sign the transcription of this statement, the police questioned her about some of the details, and she then provided a significantly different version of the events of the murders, which she then claimed to have witnessed from inside of the apartment. During the defendant's proffer, Dolan testified that, although he had reviewed the reports, other officers

had interviewed Saars-Doyle and transcribed her statements. The prosecutor elicited testimony from Dolan about the various inconsistencies in Saars-Doyle's statements, as well as the indications in the reports that she suffered from memory issues and had been drinking heavily on the night of the murders.

The trial court excluded Saars-Doyle's statements on the ground that they were too unreliable and untrustworthy to satisfy the residual exception to the hearsay rule. The court found that the statements lacked sufficient indicia of reliability because, among other things, they were "disjointed [and] largely incoherent," and they "strain[ed] credulity" because they included various inconsistencies, had notable omissions, and contradicted the crime scene evidence. The court also noted that Saars-Doyle had never been subject to formal cross-examination and that the statements contained many instances of hearsay within hearsay.

B

It is undisputed that Saars-Doyle's statements to the police, which were offered at trial for the truth of the matters asserted therein, constituted hearsay. See Conn. Code Evid. § 8-1 (3). The statements also contained double hearsay in the form of statements attributed by Saars-Doyle to Copeland, among others, requiring "each part of the combined statements [to be] independently admissible under a hearsay exception." Conn. Code Evid. § 8-7. As such, the statements in their entirety were inadmissible unless all or part of their contents fell within an exception to the hearsay rule, as set forth in §§ 8-3 through 8-10 of the Connecticut Code of Evidence.

The defendant contends that the statements were admissible under § 8-9 of the Connecticut Code of Evidence, known as the residual, or catchall, exception to the hearsay rule. The residual exception "allows a trial

court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions. . . . We have [explained] that [t]he residual hearsay exceptions [should be] applied in the rarest of cases . . . .” (Citations omitted; internal quotation marks omitted.) *State* v. *Bennett*, 324 Conn. 744, 762, 155 A.3d 188 (2017). We review the trial court’s decision to exclude hearsay evidence for abuse of discretion and make every reasonable presumption in favor of upholding the ruling. See, e.g., id., 761–62.

C

The defendant met the first requirement of the residual exception to the hearsay rule, a reasonable necessity for the admission of the statements, because Saars-Doyle was deceased at the time of trial. We conclude, however, that the trial court did not abuse its discretion in declining to admit Saars-Doyle’s hearsay statements under the residual exception because her statements were disjointed, inconsistent, implausible, and not reliable. We defer to the trial court’s factual findings that there were serious impediments to Saars-Doyle’s ability to accurately observe and recall the events in question. The record supports the trial court’s findings that Saars-Doyle had hearing and vision problems, medical and medication issues, heavy alcohol and drug use, and self-reported memory loss and shock. In light of these multiple reasons to doubt the trustworthiness and reliability of the statements, we also consider it significant that Saars-Doyle was never subjected to cross-examination regarding the numerous inconsistencies in her statements. Although the police did press her at times during their questioning, they generally did not challenge her to explain these inconsistencies. See, e.g.,

*State* v. *Bennett*, supra, 324 Conn. 763 ("[a] declarant's availability for cross-examination has been deemed particularly significant in determining whether hearsay evidence is supported by guarantees of trustworthiness and reliability"); *State* v. *McClendon*, 248 Conn. 572, 583–85, 730 A.2d 1107 (1999) (residual exception to hearsay rule was not satisfied when, among other things, declarant was not available for cross-examination), overruled in part on other grounds by *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012).

Although Saars-Doyle accurately reported certain details of the crime scene, such as the location of the victims' bodies in an upstairs bedroom, the presence of butter and work gloves, and the fact that the victims had been bound with cord or wire, many of these facts either had been publicized by the police or were revealed to Saars-Doyle prior to or during the interviews. Moreover, various other details that she provided were inconsistent with the crime scene or lacked specificity and suggested a wide range of possibilities, such as the use of various materials to bind the victims. When Saars-Doyle stated that she was prepared to tell the police about the incident, she often appeared to be changing or supplementing her account of the murders in response to prompts by the police, or asking them for more information. See, e.g., *State* v. *McClendon*, supra, 248 Conn. 584 (statement in police report was properly excluded under residual exception as not reliable and trustworthy because it "was contradicted by the evidence presented at the trial and was not corroborated by any other evidence"); *State* v. *Burton*, 191 Conn. App. 808, 840–41, 216 A.3d 734 (video recording of police interview was properly excluded under residual exception to hearsay rule because declarant was not subject to cross-examination as to critical factual uncertainties and evidence at trial failed to corroborate her

statement), cert. denied, 333 Conn. 927, 217 A.3d 995 (2019).

We further agree with the trial court that the multiple layers of hearsay rendered Saars-Doyle's statements less reliable. The narrative reports required the police to recall, characterize, and summarize what she had told them. Some statements in the various police reports were insulated by additional levels of hearsay because they derived from different declarants, including the police, Saars-Doyle's mother, her sister, and Copeland. See, e.g., *State* v. *Bennett*, supra, 324 Conn. 764 (multiple levels of hearsay undermine reliability for admissibility under residual exception to hearsay rule); *State* v. *Rivera*, 181 Conn. App. 215, 225, 186 A.3d 70 (same), cert. denied, 329 Conn. 907, 184 A.3d 1216 (2018).

Finally, the fact that Saars-Doyle signed two of her statements under penalty of law and made handwritten edits to one does not render the statements trustworthy and reliable. That each successive statement contradicted her prior statements in multiple, material respects indicates either that Saars-Doyle was unable to accurately recall and to consistently recount the events of August 21, 1987, or that she misrepresented those events in violation of her oath. For these reasons, we conclude that the trial court did not abuse its discretion by excluding Saars-Doyle's statements.

The judgment is affirmed.